## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MIDWEST ASSOCIATION OF HOUSING
COOPERATIVES, a Michigan Charitable Non-Profit
Corporation, FOUNTAIN COURT CONSUMER
HOUSING COOPERATIVE, a Michigan Non-Profit
Housing Cooperative Corporation, CORDOVA COURTS
COOPERATIVE, a Michigan Non-Profit Housing
Cooperative Corporation, GEORGETOWN PLACE CONSUMER
HOUSING COOPERATIVE, a Michigan Non-Profit Housing
Cooperative Corporation, CANTERBURY MEWS
COOPERATIVE, a Michigan Non-Profit Housing Cooperative
Corporation, BLOOMFIELD HILLS TOWNHOUSES
COOPERATIVE, a Michigan Non-Profit Housing
Cooperative Corporation, CHARTER OAKS COOPERATIVE,
a Michigan Non-Profit Housing Cooperative Corporation,
MAPLE NORTH CONSUMER HOUSING COOPERATIVE,
a Michigan Non-Profit Housing Cooperative Corporation,
UNIVERSITY TOWNHOUSES COOPERATIVE, a Michigan
Non-Profit Housing Cooperative Corporation,
BOSTON TOWNE HOUSES COOPERATIVE, a Michigan
Non-Profit Housing Cooperative Corporation,
CORONADO GARDENS COOPERATIVE, a Michigan
Non-Profit Housing Cooperative Corporation,

      Plaintiffs,

v.

JANET YELLEN, in her official capacity as the Secretary
of the United States Department of the Treasury,
UNITED STATES DEPARTMENT OF THE TREASURY,
and ANDREA GACKI, in her official capacity as
Director of Financial Crimes Enforcement Network,

      Defendants.

## COMPLAINT

1

Plaintiffs Midwest Association of Housing Cooperatives ("MAHC"), Fountain Court Consumer Housing Cooperative, Cordova Courts Cooperative, Georgetown Place Consumer Housing Cooperative, Canterbury Mews Cooperative, Bloomfield Hills Townhouses Cooperative, Charter Oaks Cooperative, Maple North Consumer Housing Cooperative, University Townhouses Cooperative, Boston Towne Houses Cooperative, and Coronado Gardens Cooperative, bring this action in their own stead and on behalf of MAHC's housing cooperative members against Janet Yellen, in her official capacity as the Secretary of the U.S. Department of the Treasury, the U.S. Department of the Treasury ("the Treasury"), and Andrea Gacki, in her official capacity as Director of the Financial Crimes Enforcement Network ("FinCEN"), seeking a declaration that housing cooperatives are exempt from compliance with the Corporate Transparency Act, 31 U.SC. § 5336 (the "CTA"); and that the CTA is unconstitutional as applied to all housing cooperative corporations, regardless of their organizational form and structure.

## PRELIMINARY STATEMENT

1.    Justice Louis Brandeis once warned—in a dissenting opinion that would later become law—that the "greatest dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 471, 479 (1928) (Brandeis, J., dissenting) (objecting against warrantless wiretap of bootleggers' private phone calls by federal agents).

The Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604, *codified at* 31 U.S.C. § 5336 (the "CTA" or the "Act")—a federal statute enacted on January 1, 2021, mandating that persons forming entities under State law report "sensitive information," *Id*. § 5336 note (6), to the federal Financial Crimes Enforcement Network ("FinCEN"), or face monetary penalties, imprisonment, or both—is just such an "insidious encroachment."

2.      The CTA's reporting requirements will apply to approximately 32.6 million "reporting companies" in 2024 and to an estimated 5 million additional companies per year thereafter, including the vast majority of MAHC's housing cooperative members and their Boards. See Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59498, 59549 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010). These "reporting companies" include not only housing cooperatives, but also mom-and-pop businesses, franchisees, manufacturers, on-line retailers, plumbers, restaurateurs, electricians, mechanics, lawyers, architects, dentists, doctors, fitness studios, landscapers, and any other privately owned enterprise or business with 20 or fewer full-time employees **or** less than $5 million in annual gross receipts or sales. See 31 U.S.C. § 5336(a)(11)(B)(xxi). But the CTA goes further. It also covers entities that are not engaged in any commercial activity at all, ***including (i) not-for-profit entities that do not have a federal 501(c) tax-exempt designation***, (ii) entities

formed by U.S. persons solely to hold private property in the State (e.g., a family residence), and (iii) local, private social clubs that have formed entities with no intent to apply for federal 501(c) tax-exempt status.

3. The primary stated purpose of the CTA is to enhance measures to combat financial crimes, such as money laundering and terrorism financing. Those are admirable and important aims. However, while attempting to fight crime, the CTA imposes its heaviest burdens on law-abiding U.S. citizens and permanent residents. The CTA's obligations to report sensitive personal information are imposed on a "reporting company" even though:

    (i)    the federal government does not know in what activities the reporting company[1] is engaged or will engage;

    (ii)    the federal government does not know whether the activities engaged in, or to be engaged in, by the reporting company constitute "commerce with foreign Nations, and among the several States, and with the Indian Tribes" such that they are subject to Congress's authority under Article I of the United States Constitution;

    (iii)    the federal government does not know or suspect that the reporting company is engaging in, or will engage in, any illegal activity or any activity that is subject to federal regulation; and

    (iv)    the federal government has no suspicion of wrongdoing, probable cause, or any other basis justifying the imposition of an obligation to

---

[1] Although we use the term "reporting company," which is used in the statute, the word "company" implies that the only entities affected by the CTA are those that engage in commerce when, in fact, State laws explicitly authorize entity formation for lawful, non-commercial purposes. Accordingly, Plaintiffs do not concede that "reporting company," as vaguely defined in the CTA, is limited to companies that engage in commerce.

divulge sensitive personal information to FinCEN for law enforcement purposes.

4.      Thus, the CTA is a law enforcement dragnet of sweeping proportions imposed by Congress on law-abiding U.S. citizens and permanent residents who own or control small businesses in the United States (as well as upon non-business entities), where neither Congress nor any other branch of the federal government has established any legal or regulatory predicate to justify this demand for personal information. The statute compels self-identification of private individuals seeking to engage in—or to continue engaging in—lawful, federally unregulated commercial and non-commercial activity under State laws allowing them to form an entity, whether or not such activity affects interstate, foreign, or Indian commerce.

5.      Compounding the error of this jurisdictional overreach, the CTA will likely weaken—rather than strengthen—the existing federal framework for collecting beneficial ownership information from economic actors in the U.S. financial system. The CTA will supplant the existing beneficial ownership reporting requirements under the Customer Due Diligence Requirements for Financial Institutions (the "CDD Rule"), which requires financial institutions to obtain beneficial ownership information from persons or entities that voluntarily avail themselves of the U.S. financial system by opening a financial account with a federally regulated financial institution. Under the CDD Rule, financial institution customers provide detailed and verifiable documentation demonstrating beneficial

ownership information, subject to vetting and reporting of suspicious activity by the relevant financial institution. The CTA, on the other hand, requires no verifiable documentation, no review of the information submitted, and no monitoring or reporting to FinCEN by a disinterested third party. Making matters worse, the CTA will likely reduce the role of financial institutions—the very actors most likely to be used for improper financial activity and most equipped to detect and prevent such activity—in combatting financial crimes. Money laundering and terrorism funding are important U.S. national security problems, but the logical cure is to establish laws that follow the money, not to build a Big-Brother database of predominantly U.S. citizens and permanent residents who are simply engaging in lawful activities. The Framers of the Constitution "conferred, as against the government, the right to be let alone – the most comprehensive of rights and the right most valued by civilized men." *Olmstead*, 277 U.S. at 478 (Brandeis, J., dissenting). The CTA turns this bedrock principle of American freedom from governmental intrusion on its head.

6.     The Act also claims to "set a clear, Federal standard for incorporation practices" for "entities formed under the laws of the States," 31 U.S.C. § 5336 note (5)(A), and prohibits any State from authorizing any "corporation, limited liability company, or other similar entity" formed under its laws from issuing "a certificate in bearer form evidencing either a whole or fractional interest in the entity," *Id*. § 5336(f). These are unprecedented federal intrusions into the States' sovereign

powers to charter and regulate the formation of entities under State law. For more than two centuries, the States have had independent, plenary authority to regulate the formation and internal structuring of corporate entities under State law, subject only to the constraint set forth in Article I, Section 10 of the U.S. Constitution that "no State shall make any Law impairing the Obligation of Contracts," which the Supreme Court has held to encompass corporate charters vested by the British Crown before the United States was established. See *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819). The federal government does not have the constitutional authority to impose additional requirements on the formation of entities under State laws nor to prescribe the conditions under which an entity charter may be granted under State laws. This includes banning one or more indicia of ownership such as bearer shares, notwithstanding the power Congress possesses to regulate entities after formation if the entities, once formed, engage in foreign, interstate, or Indian commerce.

7.    The Constitution does not grant unlimited authority to Congress. Rather, the Constitution limits Congress's authority to the specific powers enumerated in Article I and the Civil War Amendments and reserves to the States and to the People "powers not delegated to the United States by the Constitution." U.S. Const. amend. X. Consequently, the Constitution's enumeration of specific

rights "shall not be construed to deny or disparage others retained by the people."

U.S. Const. amend. IX. The CTA violates these constitutional principles:

(i) The CTA infringes on the States' sovereign powers over the formation and governance of entities under State law.

(ii) The CTA does not regulate commerce. Rather, it imposes obligations on the States and State entity filers at the moment of entity formation, which is an entirely ministerial act, not a "commercial activity" over which Congress can assert its power to "regulate Commerce." U.S. Const. art. I, § 8, cl. 3. In fact, many States permit entities to be formed for purposes other than commerce or business. See, e.g., MCL § 450.1252(a) ("a corporation may be formed under this act *for any lawful purpose*, except to engage in a business for which a corporation may be formed under any other statute of this state unless that statute permits formation under this act.") (emphasis added).[2]

(iii) The CTA's application to all entities formed under State law sweeps in entities engaged solely in activities confined to the territory of the State in which they are formed and entities that do not engage in any commercial activity at all. The CTA's indiscriminate regulation of entity formations therefore exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

(iv) The CTA infringes upon individuals' rights to apply for, form, own, and provide for the self-governance of entities under State law. By compelling individuals who apply for, form, own, or control entities formed under State law to identify themselves to the federal government where the federal government has no basis for regulatory power, the CTA violates these individuals' constitutional rights to free speech and free association.

(v) By compelling the disclosure of "sensitive" personal information for law enforcement purposes under penalty of criminal sanctions for non-

---

[2] Delaware law is more explicit in making a distinction between business and other purposes. See Del. G. Corp. L. § 101 (b) ("[a] corporation may be incorporated or organized under this chapter to conduct or promote any lawful business *or purposes*") (emphasis added).

compliance, and, in certain cases, allowing federal and foreign government agencies to access such sensitive information regarding U.S. persons without U.S. court authorization, the CTA enables "unreasonable searches and seizures" of the "right of the people to be secure in their persons, houses, papers, and effects" with no prior suspicion of wrongdoing, in violation of the Fourth Amendment. See U.S. Const. amend. IV. These aspects of the CTA also violate the privilege against self-incrimination and privacy rights protected by the Fifth and Ninth Amendments. See U.S. Const. amends. V & IX.

(vi)    The CTA is unconstitutionally vague because its definitions of "applicant" and "beneficial owner" have no evident analogues in relevant State entity laws, provide insufficient notice of who is subject to its criminal sanctions for noncompliance, and vest too much interpretive discretion in the federal government.

8.      Therefore, Plaintiffs seek declaratory and injunctive relief against the CTA's implementation to avoid an unconstitutional intrusion by the federal government into the rights of U.S. persons seeking to form corporate entities under State law and to protect the sovereignty of the States. The Act directs the Secretary of the Treasury to promulgate regulations to implement the statute. On September 29, 2022, FinCEN issued a final rule (the "Final Rule") implementing the CTA's beneficial ownership reporting requirements to take effect on January 1, 2024 for newly-formed entities and January 1, 2025 for existing entities. Consequently, immediate action by this Court to enjoin the Act and to declare it unconstitutional is necessary.

**JURISDICTION AND VENUE**

9.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. See 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702-703. It has jurisdiction under 5 U.S.C. §§ 705-706 and 28 U.S.C. §§ 1361 and § 2201-2202 to render the declaratory and injunctive relief that Plaintiffs request.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff Midwestern Association of Housing Cooperatives ("MAHC") is headquartered in Romulus, Michigan, within this judicial district and it has housing cooperative, individual, and professional members across the country with primary representation in the Midwestern States of Michigan, Illinois, Indiana and Ohio with a majority of the Plaintiff members residing within this judicial district.

11.     Defendants are agencies or officers of the United States sued in their official capacities.

**PARTIES**

12.     MAHC is a charitable non-profit organization representing and supporting over 200 housing cooperative members in the US Midwest region, offering educational programs, networking opportunities, and advocacy for the cooperative housing movement. They aim to promote affordable, sustainable, and

community-focused housing through the cooperative model. They welcome new members and support from professionals, organizations, and individuals interested in cooperative housing. MAHC is working to preserve the cooperative lifestyle through education and collaboration. MAHC's principal place of business at 37140 Goddard Rd., Romulus, MI 48174. MAHC brings this action in its own behalf and in a representational capacity on behalf of its housing cooperative members.

13.   Plaintiff Fountain Court Consumer Housing Cooperative ("FCC") was incorporated as a limited equity consumer housing cooperative in Detroit, Michigan in 1968 and created pursuant to Section 221 of Title II of the National Housing Act, as amended. FCC has 351 cooperative homes occupied by its members and continues to be regulated by the United States Department of Housing and Urban Development and is subject to a Housing Assistance Payments Agreement between itself and HUD as well as a flex sub loan through HUD.

14.   Plaintiff Cordova Courts Cooperative ("CCC") was incorporated as a limited equity housing cooperative in Clinton Township, Michigan in 1970 and created pursuant to Section 236 of Title II of the National Housing Act, as amended. CCC has 200 cooperative homes occupied by its members and continues to be regulated by the United States Department of Housing and Urban Development and is subject to a Housing Assistance Payments Agreement between itself and HUD.

15.     Plaintiff Georgetown Place Cooperative ("GPC") was incorporated as a below market interest rate limited equity housing cooperative in Taylor, Michigan in 1964, created pursuant to Section 221 (d)(3) of Title II of the National Housing Act, as amended. GPC has 194 cooperative homes occupied by its members.

16.     Plaintiff Canterbury Mews Cooperative ("CMC") was incorporated as a limited equity housing cooperative in Canton, Michigan in 1970, created pursuant to Section 236 of Title II of the National Housing Act, as amended. CMC has 410 cooperative homes occupied by its members and continues to operate as a limited equity housing cooperative providing affordable housing to its members.

17.     Plaintiff Bloomfield Hills Townhouses Cooperative ("BHTC") was incorporated as a below market interest rate limited equity housing cooperative in Pontiac, Michigan in 1970, created pursuant to Section 221 (d)(3) of Title II of the National Housing Act, as amended. BHTC has 370 cooperative homes occupied by its members and continues to be regulated by the United States Department of Housing and Urban Development and is subject to a Housing Assistance Payments Agreement between itself and HUD.

18.     Plaintiff Charter Oaks Cooperative ("COC") was incorporated as a market rate housing cooperative in Clinton Township, Michigan in 1967, created pursuant to Section 213 of Title II of the National Housing Act, as amended. COC has 403 cooperative homes occupied by its members.

19.     Plaintiff Maple North Consumer Housing Cooperative ("MNCHC") was incorporated as a limited equity consumer housing cooperative corporation in Wixom, Michigan in 1973, created pursuant to the Michigan State Housing Development Authority, as amended. MNCHC has 142 cooperative homes occupied by its members and continues to be regulated by the United States Department of Housing and Urban Development and is subject to a Housing Assistance Payments Agreement between itself and HUD.

20.     Plaintiff University Townhouses Cooperative ("UTC") was incorporated as a below market interest rate limited equity housing cooperative corporation in Ann Arbor, Michigan in 1968, created pursuant to Section 221 (d)(3) of Title II of the National Housing Act, as amended. UTC has 609 cooperative homes occupied by its members and continues to operate as a limited equity housing cooperative corporation providing affordable housing to its members.

21.     Plaintiff Boston Towne Houses Cooperative ("BTHC") was incorporated as a below market interest rate limited equity housing cooperative corporation in Clinton Township, Michigan in 1964, created pursuant to Section 221 (d)(3) of Title II of the National Housing Act, as amended. BTHC has 132 cooperative homes occupied by its members and continues to operate as a limited equity housing cooperative corporation providing affordable housing to its members.

22.     Plaintiff Coronado Gardens Cooperative ("CGC") was incorporated as a below market interest rate limited equity housing cooperative in Lansing, Michigan in 1969, created pursuant to Section 236 of Title II of the National Housing Act, as amended. CGC has 64 cooperative homes occupied by its members and continues to be regulated by the United States Department of Housing and Urban Development and is subject to a Housing Assistance Payments Agreement between itself and HUD.

23.     Defendant U.S. Department of the Treasury is an executive branch department of the federal government located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20500 responsible for the administration and enforcement of the CTA, through FinCEN, which is a bureau of the U.S. Department of the Treasury, located at 2070 Chain Bridge Road, Vienna, VA 22182.

24.     Defendant Janet Yellen is the Secretary of the U.S. Treasury and is named as a party in her official capacity.

25.     Defendant Andrea Gacki is the Director of FinCEN and is named as a party in her official capacity.

## FACTUAL ALLEGATIONS

### *The Requirements of the CTA*

26.     The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.  The stated purpose of the

CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies." To that end, the CTA requires most U.S. corporate entities to provide extensive personal ownership information to FinCEN.

27. **<u>Reporting Obligations</u>**. Specifically, the Act requires "reporting companies" to provide to FinCEN data regarding each "beneficial owner" and "applicant." Each of those terms is broadly and ambiguously defined:

- A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

- A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

- An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

28. For each of the covered individuals, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or

driver's license, or FinCEN-issued identifier number. 31 U.S.C. § 5336(b)(2)(A). This personal information must be reported upon formation or registration of the reporting company, or, in the case of existing reporting companies, in a "timely manner," and not later than two years after the effective date of the regulations that FinCEN is directed to promulgate. *Id*. § 5336(b)(1)(B), (C). If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated information to FinCEN no more than one year after the change. *Id*. § 5336(b)(1)(D).

29.    Reporting companies that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement. *Id*. § 5336(h)(1), (3).

30.    **Database of Personal Information**. The disclosures required by the CTA will be used to create a vast database of personal information regarding "beneficial owners" and "applicants."

31.    The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down. 31 U.S.C. § 5336(c)(1). For the duration of FinCEN's possession of the required personal information—which, given the lifespan of many companies, is likely to far exceed five years—FinCEN

may share the reported personal data of reporting companies with federal, State, local, and tribal law enforcement agencies; with financial institutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies. *Id*. § 5336(c)(2)(B).

32.     If the request for personal data comes from a State, local, or tribal law enforcement agency, the statute requires that it come through "appropriate protocols," and that "a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id*. § 5336(c)(2)(B)(i)(II). However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id*. § 5336(c)(2)(B)(i)(I). Likewise, if a federal agency makes a request for a beneficial owner or an applicant's personal data on behalf of a non-U.S. law enforcement agency, prosecutor, or judge, for instance, pursuant to an international treaty, then FinCEN appears to have no explicit authority to deny the request so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind.  *Id*. § 5336(c)(2)(B)(ii).

33.     Thus, for example, if a foreign government, acting pursuant to a U.S.-ratified treaty like the United Nations Convention Against Corruption, requested

certain beneficial owners' or applicants' personal data related to LLC-owned real property located in the United States, FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information.

34.     **Burdens Imposed on States**. The CTA requires that relevant federal, State, and tribal agencies, as determined by the Secretary of the Treasury, must "cooperate with and provide information requested by FinCEN" to create and maintain the intended database of "sensitive" personal information. *Id*. § 5336(d)(2).

35.     While the Act contemplates that funds will be made available to States to alleviate the financial and other burdens imposed upon them by the CTA, upon information and belief, no such funds have yet been made available. According to the CTA, as a condition of the supposed funds, "each State and Indian Tribe shall, not later than 2 years after the effective date of [FinCEN's reporting regulations]," notify reporting company filers of the personal-data reporting requirements and update relevant websites, instructions, and forms. See *Id*. § 5336(e)(2)(A). However, because the penalties for individual non-compliance with the CTA, including upon State citizens and permanent residents, are so severe and because the federal government itself has no ability to notify actual State-level filers of the CTA's requirements at the time of formation, the States will be compelled to notify their

citizens and permanent residents of the CTA's requirements to save them from fines and imprisonment, whether or not federal funds are actually made available.

### *The Form, Structure, and Operation of Housing Cooperatives*

36.     The creation, organization, management, and termination of housing cooperatives are governed by state incorporating statutes, each cooperative's Bylaws, Occupancy/Proprietary Lease Agreements and promulgated Rules and Regulations governing use and occupancy of the premises.

37.     Every housing cooperative, regardless of how and where it is formed, is a membership-based entity whose purpose is to provide affordable housing for its members and their family members in accordance with its governing documents.

38.     In addition to the governing documents established through statute, some housing cooperatives remain subject to oversight and regulatory guidance of the United States Department of Housing and Urban Development ("HUD") as they are funded through HUD insured mortgages and/or are project-based Section 8 recipients.

39.     All housing cooperative corporations are non-profit corporations recognized by IRC Section 216 as cooperative housing for tax reporting purposes. On occasion, certain 202 housing cooperatives created for the elderly may also be recognized as exempt from taxation pursuant to IRC Section 501(c)**.** All housing

cooperative corporations are governed by democratically elected volunteer Board members.

40.    All housing cooperative corporations in the State of Michigan are required to file annual statements with the state Secretary of State's office, via Michigan's Department of Licensing and Regulatory Affairs (LARA), identifying the Board members who serve as officers and directors with the requirement that a current address for each be provided.

41.    The majority of housing cooperatives require that all of their Board members must also be resident members of the housing cooperative itself and the number of directors for each can range from three to upwards of 15 or even more, depending on the cooperative's internal governance structure.

42.    Cooperatives were created for the sole purpose of providing alternative affordable housing for their members and their families with many housing cooperatives housing multiple generations of families, each with their own membership interest and appurtenant voting rights.

43.    Some housing cooperatives are created as limited equity housing cooperatives in order to maintain affordable housing through limiting the investment return on membership equity and to keep the cost of memberships at an affordable rate.

44. Some housing cooperatives are created and designed to support affordable housing at a market rate without any restriction on the amount a membership may be sold to an incoming member.

45. Some housing cooperatives are created and designed to support age-restricted communities for the elderly, 55 and older on fixed incomes.

46. The governing body of a housing cooperative is the volunteer board of directors comprised of either a majority of resident cooperator members or with the requirement that all members of the Board must also be resident members of the cooperative (the "Board"). In most instances, these individuals serve with extremely limited financial means, often times, fixed incomes.

47. Boards are democratically elected by their fellow cooperator members, who serve in that capacity as unpaid volunteers. Cooperative governing documents generally provide that Board members must be resident members within the cooperative.

48. These volunteer directors are elected to their Boards annually and sometimes more frequently in case of death, resignation, or removal by their fellow cooperator members. Boards range in size from 3 members to 15 members, or sometimes more, who typically serve terms of 1 to 3 years each.

49.     Unlike a traditional corporation or limited liability company, Board members have no different financial stake in the housing cooperative than their fellow cooperator members.

50.     Boards often have staggered terms to prevent annual turnover of the entire Board, but there is usually turnover of Board members at least once a year.

51.     Cooperative Bylaws typically contain provisions to replace Board Members who resign, die, or are removed from office. Resignation frequently follows from Board members moving out of the housing cooperative.

52.     Under ordinary circumstances, it is well recognized that housing cooperatives already have difficulty recruiting members to run and serve on their Boards. It is a time-consuming, uncompensated volunteer position that often requires Board members to resolve disputes among fellow cooperator members in their cooperative community.

53.     Conference attendees, including cooperative Board members, at the National Association of Housing Cooperative's Annual 2024 Conference in Vancouver, BC, reported that CTA reporting requirements will affect volunteer participation on the cooperative Boards, the ability to recruit future cooperator members to serve on the cooperative Boards and that many cooperative Board members will choose to resign their position from the Board leaving these

communities without any governance and putting them at risk of dissolution and the loss of affordable housing for their cooperator members.

### *The CTA's Injurious Impact on Plaintiffs*

54.     According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly five million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022). However, the CTA excludes two dozen categories of large business entities and companies, the broadest exclusion being for companies with (a) more than 20 full-time employees in the United States, (b) more than $5 million in gross receipts or sales, and (c) an operating presence at a physical office in the United States. 31 U.S.C. § 5336(a)(11)(B). Banks, insurance companies, investment funds, public companies, broker dealers, public accounting firms, money-transmitting businesses and existing shell companies with no foreign owners, assets, or active business, are also excluded. *Id*.

55.     Despite these broad carve-outs, the CTA does not exempt reporting companies formed solely by U.S. citizens or permanent residents, including small businesses with 20 or fewer full-time employees and less than $5 million in gross

receipts or sales, as well as entities formed for strictly intrastate commerce or non-business purposes, such a housing cooperatives or even such entities formed to hold a family residence (e.g., a high-profile individual wanting privacy for personal security reasons), entities that are formed with the intent to seek 501(c) federal tax-exempt status but have not yet done so (e.g., a small artists' collective), or non-profit entities such as local private social clubs that do not intend to seek 501(c) federal tax-exempt status.

56.    Nor does the Act contain any limitations that would restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing.

57.    Therefore, the Act's burden will fall substantially and disproportionately on privately-owned small businesses, including housing cooperatives and their volunteer board members, regardless of whether there is any reason to believe that these small businesses and organizations have engaged in any misconduct whatsoever.

58.    The CTA will have a profound and injurious impact on MAHC's members, including the named housing cooperative Plaintiffs. Among other burdens imposed by the CTA, cooperatives may have to consult lawyers to parse through nearly 100 pages of the Final Rule to determine whether the vague and confusing reporting requirements of the CTA apply or, alternatively, risk interpreting such terms on their own. For example, the Act provides that an individual who

"indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner." 31 U.S.C. § 5336(a)(3)(A). Businesses, including volunteer Boards in housing cooperatives, cannot know the actual meaning of "beneficial ownership" when the Final Rule defines it using vague terms such as "understanding," "arrangement," "relationship," or "otherwise."[3] Rather than sharpen or narrow the definitions of these protean terms that do not appear in State entity formation laws, the Final Rule only compounds the confusion.

59.    The reporting obligations of the CTA have no obvious analogues in the existing laws of all fifty States, none of which appear to require the disclosure of personal information regarding "applicants" and "beneficial owners" and certainly not in Michigan. For example, Michigan law requires only "(a) The name of the corporation; (b) The name of its resident agent and address of its registered office in this state; (c) The names and business or residence addresses of its president, secretary, treasurer, and directors; (d) The purposes of the corporation; and, (e) The general nature and kind of business in which the corporation is engaged.," MCL § 450.2991, not their birth dates or active personal-identification numbers as the CTA requires, and makes no reference to "beneficial owners" or "applicants." In fact,

---

[3] In another instance, the Final Rule defines "substantial control" as including a circumstance where an individual, "[h]as **any other form of substantial control** over such reporting company." 87 Fed. Reg. at 59595 (emphasis added). This definition is not only vague ("any other form"), it is also self-referential and thus virtually meaningless.

based on Plaintiffs' review of all fifty States' incorporation laws, no State appears to require birth dates or active passports, driver's licenses, or other such personal identification information for individuals who form an entity. The Act thus requires reporting of data to the federal government above and well beyond what Michigan and most States currently require for entity formations in their respective jurisdictions, and without regard to whether the entity is engaging in commercial activity or generating income such as the Internal Revenue Service requires for the reporting of such personal information for tax purposes.[4]

60.     Further, when forming a corporation in the State of Michigan, the "applicant" is already required to submit information concerning who is actually creating the corporation and the person or entity's name that is filing and submitting the required application fee on the form which becomes public record upon acceptance of the filing.

61.     Many housing cooperatives, including members of the MAHC and Plaintiffs, have tight profit margins, and/or are financially regulated by HUD, and the costs of compliance with the CTA's requirements will be considerable. A housing

---

[4] In another instance, the Final Rule defines "substantial control" as including a circumstance where an individual, "[h]as any other form of substantial control over such reporting company." 87 Fed. Reg. at 59595 (emphasis added). This definition is not only vague ("any other form"), it is also self-referential and thus virtually meaningless. Commercial activity or generating income such as the Internal Revenue Service requires for the reporting of such personal information for tax purposes.

cooperative Board would first have to consult an attorney to see if he, she, or they qualify for a CTA exemption. If the answer is no, the relevant person or persons in charge of the "reporting company" would have to determine who its "beneficial owners" are. Determining beneficial owners in a housing cooperative is not always an easy feat particularly if certain important decisions are left to the entire membership of the housing cooperative and not just the democratically elected Board. Furthermore, because the necessary "sensitive" personal data regarding beneficial owners would have to be updated, affected housing cooperatives, and other persons may have to consult attorneys again when their circumstances change. Not only are the housing cooperatives of limited means but, in many cases, the members are also on a fixed income and cannot afford to pay an attorney to assist them. These Americans will likely have to pay hundreds or even thousands of dollars to attorneys to navigate the statute's labyrinthine reporting requirements. The threat of such crippling federal regulatory overhang on housing cooperative Boards and the members of these cooperatives was one of the reasons why MAHC was formed in the first place.

62.    The CTA contains no provisions to protect individuals who have formed or would form entities for associational or similar reasons, without seeking or having yet applied for 501(c) federal tax-exempt status, such as a local all-women's social club formed to discuss current health, reproduction rights, and

sexual orientation issues in a confidential group setting. In so doing, such persons are exercising their constitutionally protected free speech and association rights. The prospect of reporting their sensitive personal information to FinCEN may deter or chill such persons from participating in the management of the entity in a significant way and thereby risk being classified as a "beneficial owner" or "applicant" because of fear of exposure of their beliefs or activities. These concerns are substantial given the fact that the statute encompasses potential access to the personal information even by foreign governments, such as a Chinese government request for information about the "beneficial owners" of an entity established under State laws by U.S. persons to protest Chinese government policies.

63.    The burdens the CTA imposes upon entity formation in every State will have a direct, predictable impact on MAHC itself. An important service MAHC offers to its membership is the provision of information, education, resources and assistance regarding legal and regulatory compliance issues faced by housing cooperatives. To serve faithfully the needs and interests of its membership, MAHC has already been—and will continue to be—forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect operations, and what they must do to comply.

64.    The benefits of the CTA do not justify the burdens it imposes on non-profit housing cooperative corporations. To the contrary, the CTA does little to effectively combat financial crime and is inferior to the existing CDD Rule.

65.    The CTA was enacted to supplant existing beneficial ownership reporting requirements under the CDD Rule.[5]  The existing CDD Rule requires financial institutions to develop and update a risk profile (specifically for anti-money laundering and illicit transaction purposes) for every customer and obtain documentary and verifiable beneficial ownership information, including formation and governance documents, passports, driver's licenses, home addresses, trust agreements, or other information. The information submitted under the CDD Rule is reviewed, vetted, and verified by compliance staff of covered financial institutions (e.g., banks, credit unions, brokers, dealers, and registered investment advisors). Furthermore, these financial institutions have an ongoing obligation to monitor their client relationships and report suspicious activities to FinCEN.

66.    The CTA, on the other hand, requires no supporting documentation, no review of the information, and no third-party monitoring or reporting to FinCEN about suspicious financial activity. Without a disinterested intermediary to make sure

---

[5] See 31 U.S.C § 5318(h) and 31 CFR § 1010.210 for anti-money laundering program requirements, and, as applied to specific financial institutions, in 31 C.F.R. §§ 1020.210, 1021.210, 1022.210, 1023.210, 1024.210, 1025.210, 1026.210, 1027.210, 1028.210, 1029.210, and 1030.210.

that filers are making full and accurate disclosures, bad actors will manipulate or avoid disclosure requirements, undermining the purported purpose of the CTA. The likely result is that the CTA will simply create a database containing personal information about law-abiding reporting companies and their owners who will predominantly be U.S. persons, not the foreign individuals and entities engaging in money laundering and illegal activities that the statute was designed to target.

67.    The CTA is nothing more than a first salvo in a campaign to transfer responsibility from the very institutions (*i.e.*, big banks, financial institutions, and escrow agents, which are exempted from the CTA's coverage) that process the targeted illicit transactions to law-abiding, volunteer Board members elected to serve their memberships in furthering the availability of alternative affordable housing. It is the quintessential example of the government prioritizing Wall Street to the detriment of Main Street. Plaintiffs fully support Congress's desire to attack money laundering and terrorism financing, but passing an unconstitutional statute penalizing hard-working Americans' dream of home ownership is not the answer.

68.    Compliance with the CTA will be unduly burdensome for housing cooperatives and will lead to mass resignations from their Boards leaving these corporations without any Directors to govern the corporation and consequently result in the dissolution of corporations designed specifically to provide affordable housing in a country facing an unprecedented housing crisis.

69.    Michigan housing cooperatives are already required by law to file an annual statement with LARA listing the names and addresses of the current cooperative Board members. The document is usually completed and filed by a cooperative Board member, a management agent, or the cooperative attorney. Failure to file the required annual report for three years results in automatic dissolution of the entity with the ability to reinstate after payment of late fees and the filing of the missing reports.

70.    The State of Michigan does not require housing cooperative Board members to provide personal identifying information, such as birth dates, active driver's license or passport information, or accompanying photo identification.

71.    Uncontrolled access to that information, such that CTA requires, makes housing cooperative Board members increasingly vulnerable to data breaches and possible identity theft, even inadvertently.

72.    For the same reasons, cooperative Boards and agents will be reluctant to take responsibility for collecting and storing other Board members' personal identifying information.

73.    Nor will cooperative Board members or agents want to be responsible for filing BOI reports or tracking when the updated reporting requirements are triggered for as many as 15 or more board members—such as when a member resigns, changes their name, or renews their driver's license or passport—given that

they or the Association face steep penalties if amended reports are not filed within thirty days of such changes.

74.    In addition to the above-described burdens imposed by the CTA, volunteer Board members may be forced to expend limited resources to consult lawyers to parse through nearly 100 pages of regulations to determine whether the vague and confusing reporting requirements of the CTA apply, or alternatively, risk incurring severe penalties for interpreting such terms on their own, IF they are even aware of the law.

75.    Board members are unlikely to know the legal meaning of "beneficial ownership" under the vague terms of the statute and regulations.

76.    For example, the CTA defines a "beneficial owner," in part, as an individual or entity that "directly or indirectly, through any contract, arrangement, understanding, [or] relationship… exercises substantial control" over the entity. 31 U.S.C. § 5336(a)(3)(A).

77.    The term "substantial control" could apply to make a property manager or managing agent hired by the housing cooperative a "beneficial owner" whose personal identifying information must be reported to FinCEN.

78.    By the same token, the entire membership could be considered "beneficial owners" because state statutes and/or Bylaws give cooperator members

the power to elect Board members and also, in some cases, the power to ratify or veto certain Board decisions.

79.    If a statute or the Bylaws require the Board to "obtain the approval of a majority of cooperative members" to pass an annual budget, authorize an improvement to the common areas, obtain a loan, call a special meeting, or vote to remove a Board member, the entire membership could be viewed as exercising "substantial control" of the housing cooperative corporation.

80.    Conversely, the CTA also defines a "beneficial owner" as one who owns or controls "not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). An individual who owns 25% of the units in the housing cooperative need not be a member of the Board, in which case that individual would have no power over the operation or finances of the Board. Yet that cooperator member is considered a "beneficial owner" whose personal identifying information must be reported to FinCEN despite having no ability to engage in illegal financial transactions on behalf of the entity.

81.    If that individual refused to provide their personal identifying information to FinCEN, the entire Cooperative would be subject to liability for severe non-reporting penalties under the CTA.

### *The CTA's Injurious Impact on Volunteerism*

82.     The CTA's reporting requirements, and risk of personal liability for non-reporting penalties, will deter cooperator members from volunteering to serve on their Boards.

83.     Congress expressly recognized that volunteerism is adversely impacted by the risk of potential personal liability in adopting the Volunteer Protection Act, 42 U.S.C. §§ 14501, et seq., which limits a volunteer's risk of tort liability when acting for nonprofit organizations or governmental entities.

84.     With the Volunteer Protection Act, Congress found that "the willingness of volunteers to offer their services to nonprofits and other organizations is deterred by the potential for liability actions against them" and, "as a result, many nonprofit public and private organizations … have been adversely affected by the withdrawal of volunteers from boards of directors and services in other capacities." 42 U.S.C. §§ 14501(a)(1), (2).

85.     Similarly here, requiring Board members to provide personal information to the federal government as part of CTA compliance—and be subject to personal liability if they or other Board members do not comply with the CTA's reporting requirements— will not only exacerbate cooperator members' reluctance to volunteer for these positions, it will also result in a slew of resignations that will disrupt the operation of housing cooperatives across the United States. It could even

result in cooperator members simply selling their membership interests to avoid having to potentially report to FinCen solely because of their chosen form of home ownership.

### *Housing Cooperatives are Not Engaged in Interstate Commerce*

86.    Housing cooperatives are not created for the purpose of engaging in commerce, and to the extent they are deemed to engage in interstate commerce, they are non-profit entities.

87.    Their primary purpose is to provide affordable housing for their cooperator members and their families. While market-rate cooperatives may operate similarly to condominiums where members purchase their membership interest at market prices, limited equity housing cooperatives offer their members long-term housing affordability and stability, making homeownership attainable for a more diverse range of income levels.

88.    Housing cooperatives are committed to democratic decision making where each member is empowered to have a direct say in the management and future of their home, regardless of their financial position, by virtue of their equal voting power.

89.    These non-profit entities are required by statute to have a board comprised of members whose primary function is to provide affordable housing and to perform any kind of activity necessary to carry out that function. They are

communities built on principles of shared interests and governance akin to a municipality.

90.    The activities of housing cooperatives are overwhelmingly intrastate rather than interstate.

91.    The prospect of having to report sensitive personal identifying information to FinCEN is likely to deter cooperator members from serving on their Boards to avoid the personal risks associated with being a "beneficial owner" or "applicant."

92.    Without cooperator members willing to serve as Board members, housing cooperatives will no longer be able to serve in an advocacy role for their cooperator members in the community.

93.    As a result, Housing Cooperatives will be denied the opportunity to exercise their free speech and free association rights in violation of the First Amendment.

94.    The benefits of the CTA do not justify the burdens it imposes on housing cooperatives.

### *Housing Cooperatives are Non-Profit Organizations Exempt from the CTA*

95.    Congress specifically excluded non-profit organizations ("NPOs") from the CTA's reach: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and

36

exempt from tax under section 501(a) of such Code." 31 USC § 5336(a)(11)(B)(xix) ("NPO Exemption").

96.     For the last decade, Treasury and FinCEN have published the National Terrorist Financing Risk Assessment Report ("NTFRA Report") in which they have stated that "the vast majority of U.S.-based tax-exempt [NPOs] face little or no risk of being abused for [terrorist financing]." 2024 National Terrorist Financing Risk Assessment, p. 23-25.3

97.     The 2024 NTFRA Report states that NPOs are considered very low risk for engaging in illicit financial activity because they abide by internal due diligence standards, self-governance, transparency, and other accountability and compliance measures. *Id*.

98.     Within that Report, there is no statistic to show that housing cooperative corporations create any risk for being used for terrorist financing and/or money laundering. Most housing cooperative corporations are either already subject to HUD financial oversight or, if not, have extremely limited financial resources because they simply do not operate for profit.

99.     Section 5336(a)(11)(B)(xxiv) of the CTA allows FinCEN to create additional exemptions when the collection of BOI "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent,

or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 USC § 5336(a)(11)(B)(xxiv).

**FinCEN's Improper Issuance of FAQs Classifying Homeowners Associations, Including Housing Cooperatives, as Reporting Companies Subject to the CTA**

100.   On December 28, 2023, Community Associations Institute ("CAI") submitted a request to FinCEN seeking an exemption from the CTA's reporting requirements under the NPO Exemption for all community living associations, including homeowners associations, condominium associations, and housing cooperatives.

101.   The correspondence stated that, although Community Associations are not organized under Section 501(c) of the Internal Revenue Code, they are non-profit organizations that operate the same way as the Section 501(c) NPOs that are excluded from the CTA's reporting requirements. Accordingly, it requested that Community Associations be granted the same exclusion.

102.   Instead of responding to CAI's correspondence, FinCEN released a Frequently Asked Question ("FAQ") regarding the categorization of homeowners associations as reporting companies on its website. FAQ C.10 now claims that homeowners associations are considered a reporting company. FAQ C.10 states:

C. 10. Are homeowners associations reporting companies?

It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a

38

secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.

[Updated June 10, 2024]

103.   Further, FAQ D.13 details who the "beneficial owner" of a homeowners

association is under the CTA. FAQ D.13 states:

D. 13. Who is the beneficial owner of a homeowners association?

A homeowners association (HOA) that meets the reporting company definition and does not qualify for any exemptions must report its beneficial owner(s). A beneficial owner is any individual who, directly or indirectly, exercises substantial control over a reporting company, or owns or controls at least 25 percent of the ownership interests of a reporting company.

There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:

the individual is a senior officer;
the individual has authority to appoint or remove certain officers or a majority of directors of the HOA;
the individual is an important decision-maker; or
the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024]

104.   By issuing these FAQs in lieu of responding to CAI's exemption

request, FinCEN improperly denied CAI and homeowners associations, including

housing cooperatives, the opportunity to engage in any meaningful discussion before it created a new categorization of Community Associations as reporting companies and created identification criteria for determining "beneficial ownership" without engaging with CAI.

105.   On July 25, 2024, FinCEN responded to CAI's exemption request sent seven months earlier. FinCEN stated that, if a Community Association met the definition of a "reporting company," it would be required to report BOI to FinCEN under the CTA.

106.   FinCEN also stated that it would consider CAI's exemption request, but noted that Community Associations should comply with the BOI reporting requirements absent an exemption.

### FinCEN's FAQ C.10 and D.13 are final administrative decisions under the Administrative Procedure Act ("APA")

107.   FinCEN's July 25, 2024 correspondence also demonstrates that it treats the FAQs as controlling in the same manner as a legislative rule. Therefore, they are "binding" for purposes of asserting an APA challenge.

108.   The FAQs categorize some community associations as reporting companies and identify criteria for determining who their beneficial owners might be. The FAQs are FinCEN's only determination on this topic, despite CAI's correspondence requesting an exception to the CTA's reporting requirements months earlier.

40

109.   Further, legal consequences flow from FinCEN's FAQ since, as stated in the FAQs, there are "direct and appreciable legal consequences" should a community association not comply with the reporting category as outlined in FAQ C.10.

110.   These FAQs will lead Community Associations, and Plaintiffs, to believe that they substantively control the categorization of their entities as it relates to the CTA.

### The CTA was Declared Unconstitutional by the United States District Court for the Northern District of Alabama

111.   On March 1, 2024, in the case of *National Small Business United v. Yellen*, No. 5:22-cv-01448 (N.D. Ala.), a federal district court in the Northern District of Alabama entered a final declaratory judgment concluding that the CTA exceeds the Constitution's limits on Congress's power and enjoined the Department of the Treasury and FinCEN from enforcing the CTA.[6] MAHC now seeks a similar ruling as it applies to housing cooperatives and MAHC's housing cooperative members and/or a declaration that CTA does not apply to housing cooperatives.

---

[6] On March 11, 2024, the United States Department of the Treasury and FinCEN appealed that Judgment to the 11th Circuit Court of Appeals, where it remains pending.

**CAUSES OF ACTION**

**COUNT I**
**Declaratory Judgment Under 28 U.S.C. §§ 2201 et seq.**

112.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

113.   An actual controversy exists as to whether non-profit housing cooperative corporations are exempt from compliance with the CTA.

114.   Accordingly, Plaintiffs seek, pursuant to 28 U.S.C. § 2201, a judgment declaring that the CTA does not apply to housing cooperatives.

115.   A declaration is necessary and appropriate at this time to affirm that housing cooperative corporations are not reporting companies under the CTA because, in the absence of such a declaration, they may face federal prosecution resulting in harsh criminal and/or civil penalties for wrongful non-compliance.

116.   Many housing cooperatives are subject to HUD regulatory oversight either through project-based Section 8 subsidization or HUD insured loans and mortgages.

117.   One of the exceptions for the CTA includes certain entities that are already subject to federal regulatory oversight. Accordingly, this Court should declare that the beneficial ownership reporting requirements of the CTA do not apply to housing cooperatives.

118.   Plaintiffs further request, pursuant to 28 U.S.C. § 2201, that the Court enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Community Associations and their respective Community Board members.

## COUNT II
### Unconstitutional Usurpation of the States' Power to Regulate Entity Formations in Excess of Congress's Constitutional Powers
### (U.S. Const. Art. I, amends. IX, X)

119.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

120.   For more than two centuries, the States have had independent authority to charter corporations and otherwise regulate the formation and governance of corporations they have chartered. This was a sovereign power of the British Crown that was commonly understood to have devolved to the original thirteen States through their charters after the adoption of the Declaration of Independence in 1776. The newly independent States began chartering corporations soon after independence for the purposes of creating financial and transportation infrastructure, forming subordinate municipal governments, and for charitable and other public purposes. See Ronald E. Seavoy, *The Public Service Origins of the American Business Corporation*, 52 Bus. History R. 30, 33 (1978).

121.   The Constitution did not intrude on this power of the States to charter corporations. At the Constitutional Convention, Virginia delegate James Madison

introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 *The Records of the Federal Convention of 1787*, at 615 (Max Farrand, ed., 1911). Madison's proposal reflected the settled understanding that the States possessed—and would continue to retain under the new Constitution—the primary sovereign powers for chartering corporate entities. See Id. at 616 (containing James Madison's notes documenting the defeat of his proposal for an explicit Congressional power of chartering corporations by a vote of 3 in favor and 8 against).

122. As the Supreme Court made clear in 1819, other than ensuring that State legislatures did not impair vested colonial-era corporate charters, the Constitution does not vest the federal government—including Congress and the Treasury Department—with any authority to dictate to the States the terms under which they charter companies. See *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819). This fundamental principle remains true today, as corporations formed for private business purposes have proliferated and now outnumber the public-purpose and non-commercial corporations prevalent in the Founding era. The States remain the primary sovereigns for the creation of corporate entities and, pursuant to the well-established "internal affairs" doctrine, the internal functioning of such entities remains a matter of the law of the State of formation. "It thus is an

44

accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91, (1987).[7]

123.    Despite this original constitutional meaning, history, and tradition, the CTA aims to establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A), above and beyond what State entity laws require, imposing a penalty—mandatory disclosure of names, addresses, birth dates, and identification numbers of all beneficial owners and applicants—on persons who seek to form entities under State law. As detailed above, failure to make these disclosures is punishable by fines and imprisonment. In addition, the CTA also interferes with State authority to determine the permissible structures of corporate ownership by prohibiting any State from authorizing the issuance of "a certificate in bearer form evidencing either a whole or fractional interest" in an entity created and organized under that State's laws. 31 U.S.C. § 5336(f). Upon information and belief, although many States authorized such bearer certificates through the early twenty-first century, no State currently does so. Nevertheless, the Act's categorical prohibition is

---

[7] Although Congress has the ability to create federally chartered corporations, it has no authority to intervene in the internal affairs of entities organized under State law, except as noted above.

an unprecedented intrusion on the States' sole authority to regulate the formation and governance of State-entities' internal affairs.

124.   One of the enumerated powers of Congress—and perhaps the most heavily used of those powers in recent decades—is the power to regulate foreign, interstate, or Indian commerce. Congress also can wield its taxing power to tax income earned by individuals through corporate entities as it currently does through federal income taxes on corporations. However, Congress has no regulatory interest or constitutional authority over corporate formation because a reporting company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception. The formation of an entity under State law is an entirely ministerial act and many entities will engage in no activity until some indeterminate time after they have been formed.

125.   Indeed, many of the "reporting companies" subject to the Act may never engage in any such foreign, interstate, or Indian commerce. State law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as residential housing associations. For example, MCL § 450.1252 of the Michigan Business Corporation Act indicates that "a corporation may be formed under this act for any lawful purpose, except to engage in a business for which a corporation may be formed under any other statute of this state unless that statute permits formation under this act." MCL § 450.1252(a). Section 101(b) of the

Delaware General Corporation Law provides that a "corporation may be incorporated or organized under this chapter to conduct or promote any lawful business or purposes, except as may otherwise be provided by the Constitution or other law of this State." 8 Del. Code § 101(b) (emphasis added). Similarly, Section 18-106(a) of the Delaware Limited Liability Company Act provides that "[a] limited liability company may carry on any lawful business, purpose or activity, whether or not for profit . . . ." 6 Del. Code § 18-1101. A large proportion of the CTA's coverage is thus likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as housing cooperatives) outside the reach of federal regulation.

126. This fact exposes a fundamental flaw in the CTA's structure: it does not regulate any specifically identified **commercial** activity. "The Constitution grants Congress the power to '*regulate* Commerce.' The power to regulate commerce presupposes the existence of commercial activity to be regulated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 520 (2012) (emphasis in original). As discussed above, there is no exercise of commerce inherent in the creation of a state-chartered entity; it is an entirely ministerial act, and many entities so formed do not engage in any commercial activity. By imposing requirements on the mere act of entity formation without any inkling as to whether the formed entity will engage in

commercial activity, the CTA clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

127. The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form. Because the States are the only agents capable of providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

128. Through these requirements, the CTA violates Plaintiffs' rights and the rights of all MAHC members by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State sovereignty upon which this Nation was founded.

**COUNT III**
**Unconstitutional Invasion of Privacy; Unreasonable Search and Seizure**
**Violation of the Fourth Amendment; Compelled Self Incrimination Violation**
**of the Fifth Amendment; Right of Privacy Violation of the Ninth Amendment**
**(U.S. Const. Amends. IV, V, IX)**

129. Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

130.   The CTA is a statute providing for criminal punishments enacted for the purpose of harvesting "sensitive" personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies. The stated purpose of the CTA is to provide the federal government with a supplemental means of enforcing federal criminal laws. No matter the degree of invasiveness, suspicionless searches and compelled disclosures are never allowed if their principal end is crime-solving.

131.   Privacy is often a key motivation in State entity formation. No State has chosen to require the extent of disclosure of beneficial ownership and applicant information upon filing that the CTA mandates. Upon information and belief, no State, for instance, appears to require birth dates and personal identification numbers of filers or photo id's and drivers licenses. The States' entity-formation laws reflect the judgment that individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such State laws have a reasonable expectation of privacy from the intrusion of the federal government as to that information. The CTA's requirements violate that expectation of privacy by compelling the disclosure of that information by individuals protected by the Fourth, Fifth, and Ninth Amendments.

132.   The CTA contains no limitations on the provision of the required personal information to situations where there is an articulable individualized

suspicion of a crime or wrongdoing by such beneficial owners and applicants. The CTA also authorizes the provision of private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

133.   By requiring, under threat of criminal penalty, reporting companies to provide individuals' "sensitive" personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiff and the members of MAHC and Housing Cooperatives of their privacy rights and violates the Fourth Amendment, Fifth Amendment, and Ninth Amendment of the Constitution of the United States.

134.   By compelling disclosures and permitting the release of sensitive personal data to federal and foreign government agencies without the reporting company's consent or authorization from a court of competent jurisdiction, see 31 U.S.C. § 5336(c)(2)(B) (requiring court authorization for requests from state, local, or tribal law enforcement agencies and consent from a financial institution, without imposing a similar requirement of court authorization for requests from federal or non-U.S. law enforcement agencies), the CTA violates the Fourth, Fifth, and Ninth Amendment rights of Plaintiffs and the members of MAHC.

**COUNT IV**
**Compelled Speech and Unreasonable Burdens on the**
**Freedoms of Speech and Association**
**(U.S. Const. Amend. I)**

135.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

136.   Under the CTA, the obligation to report personal information to the federal government arises at the time of formation of an entity under State law. The CTA forces filers to disclose more personal information to the federal government than what is required to be disclosed under State entity-formation statutes; in most States, disclosure of "beneficial ownership" as expansively set forth in the CTA and "applicant" personal information is not required at all. State laws providing for entity formation, however, reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation.

137.   Housing Cooperatives are required to form entities under State law, without seeking 501(c) federal tax-exempt status, for the purpose of providing affordable housing and all benefits of membership associated with a housing cooperative, all of which is affiliated with home ownership. They need volunteer cooperator members in the form of Cooperative Boards to run the cooperatives. Many of these U.S. persons who would have to be registered under the CTA have a heightened reason to desire privacy, as this pertains solely to their ownership of their home.

138.   The CTA compels Housing Cooperatives and Cooperative Board members to publicly reveal their associations to the federal government, which may in turn transmit that information upon request to: (i) federal and State law enforcement agencies, courts, and prosecutors; (ii) foreign governments and law enforcement authorities; (iii) financial institutions; and (iv) various federal regulators and regulatory agencies.

139.   This forced disclosure will also deter such persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions within Housing Cooperatives in the entities (and thus arguably becoming "beneficial owners"). It will also affect Housing Cooperatives' ability to advocate on behalf of their members for issues that affect their local communities.

140.   The United States does not have a compelling, overriding interest in obtaining the information required by the CTA because less onerous alternatives are available to accomplish the stated goals of the CTA and the methods employed by the Act are not narrowly tailored for their stated purpose.

141.   The most obvious and direct way to stem money laundering and international terrorism funding is to ramp up regulation and scrutiny of large cross-border money transfers, for instance, by banks, financial agents, and escrow agents. The requirements of the CTA are neither justified by nor necessary to promote the stated goals of the CTA.

142.   By requiring, under threat of criminal sanction, MAHC and its member Housing Cooperatives and Cooperative Board members to disclose information in the manner mandated by the CTA despite the availability of less onerous alternative methods to achieve the statute's stated goals, the CTA's disclosure requirements constitute compelled speech in violation of the First Amendment to the Constitution of the United States.

143.   By requiring U.S. persons who have formed, wish to form or who have volunteered to participate in the governance of a Housing Cooperative to engage in protected speech despite the availability of less onerous alternative methods to achieve the stated goals of the CTA, the CTA violates the First Amendment by burdening the right to speech and private association. As the Supreme Court recently affirmed, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored. This requirement makes sense. Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

## COUNT V
### Unconstitutional Violation of Due Process (U.S. Const. Amend. V)

144.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

53

145.    Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for Plaintiffs, members of the MAHC, or other ordinary small businesses or non-business entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "substantial control," and "applicant." All these terms, most significantly "beneficial owner" and "applicant," have no obvious analogue in State entity formation laws, which typically address "organizers" and "incorporators." In addition, the CTA's overall framework for mandatory reporting, updating, access, and record-keeping is so vague and complex that Plaintiffs, members of the MAHC, or other similarly situated housing entities cannot reasonably comply with these requirements.

146.    Should Plaintiffs, members of the MAHC, and other similarly situated housing entities be forced to attempt to comply with the vague and complex requirements of the CTA to avoid criminal penalties, they will be forced to incur substantial costs and other burdens. The stated goals of the CTA do not justify the enormous burden it places on small businesses and non-business entities and can be accomplished through less onerous alternative means.

147.    By subjecting Plaintiffs and all other individuals, including millions of U.S. persons, covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, and, by the same token,

expanding the federal government's discretion in enforcing the requirements, the CTA violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

## COUNT VI
## Unconstitutional Infringement of Right of Equal Protection

148.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

149.   Under the Equal Protection Clause of the Fifth Amendment, Plaintiffs must be afforded equal protection of the laws, ensuring similar treatment to similarly situated persons.

150.   FinCEN, Treasury, and related federal agencies have publicly recognized that the "vast majority" of domestic nonprofit organizations ("NPOs") "face little or no risk" of being used in terrorist financing schemes, for example, because they observe certain due diligence practices, including self-governance, transparency, and other accountability and compliance measures.

151.   Under Section 31 U.S.C. § 5336(a)(11)(B)(xix) of the CTA, an NPO described in Section 501(c) of the Internal Revenue Code and exempt from tax under Section 501(a) of that Code, are exempt from the CTA's filing requirements. 26 U.S.C. § 501(a), (c).

152.   Housing Cooperatives are required by state law to operate as NPOs (or Not-for-Profit Organizations) and therefore observe the same due diligence

practices, including self-governance, transparency, and other accountability and compliance measures, as other NPOs.

153.   Housing Cooperatives are required by state law to provide members, and often prospective members and their lenders, with open access to their financial records and books upon request. As a matter of industry standard, many Housing Cooperative Bylaws also require that their financial records be audited or inspected by an independent auditor on an annual basis.

154.   Despite the fact that state laws create Housing Cooperatives as NPOs, make their financial records available to members and other legally authorized persons upon request, FinCEN refuses to grant Housing Cooperatives an exemption from the CTA's filing requirements under the NPO Exemption.

155.   The CTA and FinCEN's application of it infringes on Plaintiffs' and their members' rights to equal protection of the law. NPOs must comply with the CTA, but tax-exempt NPOs organized under Section 501(c) of the Code do not, even though both categories of NPOs observe the same due diligence practices that make them of "little or no risk" of engaging in the types of financial crimes targeted by the CTA. 2024 National Terrorist Financing Risk Assessment, p. 23-25; see also 31 USC § 53365336(a)(11)(B)(xxiv).

156.   The Government cannot articulate any legitimate interest or rational basis for exempting NPOs organized under Section 501(c) of the Code from the

requirements of the CTA but not exempting other NPOs despite having the same or functionally similar disclosure requirements.

157. By subjecting Plaintiffs, Housing Cooperatives, and their Board members to the requirements and burdens of the CTA, including possible imprisonment, while simultaneously allowing exemptions for NPOs organized under 501(c) of the Code, the CTA violates the guarantee of equal protection under the Fifth Amendment to the Constitution of the United States.

## COUNT VII
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D) Lack of Notice and Comment (FAQs C.10 and D.13)

158. Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

159. The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

160. The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, 5 U.S.C. § 553(b), and to "give interested persons as opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

161. Agencies must follow notice-and-comment procedures when proposing new rules, except where the agency is merely promulgating "interpretive rules,

general statements of policy, or rules of agency organization, procedure or practice."
5 U.S.C. § 5(b).

162.   FAQs C.10 and D.13 are final agency actions subject to judicial review under the APA because they create new rules not sourced from the statutory authority or governing rule.

163.   FAQs C.10 and D.13 are not mere interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice. Rather, they significantly affect Community Associations' rights and obligations.

164.   As such, FAQs C.10 and D.13 are legislative rules that substantively amended FinCEN's existing CTA regulations and are subject to the notice-and-comment procedures under the APA, but were issued and became effective without notice and comment in violation of the APA.

165.   Accordingly, pursuant to 5 U.S.C. § 706(2)(D), Plaintiffs request that the Court declare unlawful and set aside FAQs C.10 and D.13 and enjoin Defendants from enforcing, applying, or implementing FAQs C.10 and D.13.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Declare that the CTA does not apply to Housing Cooperative Corporations;

B.    Declare unlawful and set aside FAQs C.10 and D.13 because FinCEN failed to follow the Administrative Procedure Act's notice-and-comment procedures and FinCEN's denial of CAI's request for an exclusion for all homeowner's associations, including housing cooperatives such as Plaintiffs, under the CTA was arbitrary and capricious

C.    Declare that the CTA exceeds Congress's authority under Article I of the Constitution and encroaches upon the States' respective sovereignties in violation of the Ninth and Tenth Amendments and constitutional principles of federalism and retained State sovereignty;

D.    Enjoin the Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Plaintiffs and all Housing Cooperative Corporations and their respective Board members;

E.    Declare that the CTA is unconstitutional facially or as applied to Plaintiffs and Housing Cooperatives;

F. Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA generally or as against Plaintiffs, Housing Cooperatives, and their respective volunteer Board members and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

G. Purge and destroy any personal identifying information provided by Housing Cooperatives and their respective Board members to FinCEN and over which it currently maintains possession; and

H. Award Plaintiffs their costs and attorneys' fees and grant such other relief as the Court may deem just and proper.

Respectfully submitted,
**PENTIUK, COUVREUR & KOBILJAK, P.C.**

By: /s/Randall A. Pentiuk
Randall A. Pentiuk (P32556)
April Knoch (P61329)
Attorneys for Plaintiffs
2915 Biddle Avenue, Suite 200
Wyandotte, MI  48192
Tel:  (734) 281-7100
Fax: (734) 281-7102
rpentiuk@pck-law.com
aknoch@pck-law.com

Dated: November 5, 2024